BABBIT ELECTRONICS, INC., Plaintiff,

v.

DYNASCAN CORPORATION, Defendant.

No. 89–7048–CIV.

United States District Court,
S.D. Florida.

June 22, 1993.

Robert E. Wagner, Alan L. Barry, James J. Jagoda, Wallenstein, Wagner & Hattis, Ltd., Chicago, IL, Mitchell R. Bloomberg, Ellen M. Leibovitch, Adorno & Zeder, P.A., Miami, FL, for defendant.

Edward M. Joffe, Peter Fudali, Sandler, Travis & Rosenberg, P.A., Miami, FL, for plaintiff.

## AMENDED MEMORANDUM OPINION AND ORDER

HIGHSMITH, District Judge.

On December 22, 1989, Plaintiff Babbit Electronics, Inc. ("Babbit") filed this fraud and tortious interference cause of action against Defendant Dynascan Corporation ("Dynascan"). In response, Dynascan filed a counterclaim against Babbit seeking redress for a variety of trademark infringement and breach of contract violations. The complaint and the counterclaim were tried before the Court without a jury, commencing on November 12, 1992, and pursuant to *Fed. R.Civ.P.* 52(a), the Court makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Babbit Electronics, Inc., is a Florida corporation with its principal place of business at 1060 N.W. 1st Court, Hallandale, Florida, 33009.

2. Sol Steinmetz is an individual and a citizen of Florida. Sol Steinmetz is a principal shareholder of Babbit and is the Chairman of Babbit.

3. Robert Steinmetz is an individual and a citizen of Florida. Robert Steinmetz is a principal shareholder of Babbit and is the President of Babbit.

4. Dynascan is a Delaware corporation with its principal place of business at 6500 West Cortland Street, Chicago, Illinois, 60635.

5. This Court has jurisdiction of this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332 and 1338, as well as the doctrines of pendent and ancillary jurisdiction.

6. Dynascan is the owner of United States Registration Nos. 1,054,247, issued December 14, 1976; 1,366,377 issued, October 22, 1985; 1,366,378, issued October 22, 1985; 1,367,356, issued October 29, 1985; 1,525,454, issued February 21, 1989; and 1,530,680, issued March 21, 1989, for its Cobra trademark and variations of the Cobra trademark. Each of these registrations are valid and subsisting and are listed on the Principal Register of the United States Patent and Trademark Office. As to Registrations 1,054,247, 1,366,377, 1,366,378, and 1,367,356, affidavits pursuant to § 8, 15 U.S.C. § 1058, and § 15, 15 U.S.C. § 1065, have been filed and each of these registrations is now statutorily incontestable.

7. Dynascan's trademark registrations nos. 1,054,247; 1,366,377; 1,525,454; and 1,530,680 are recorded with Customs bearing recordation nos. 83-136; 88-328; 90-130, superseding 89-391; and 90-129 respectively.

8. Dynascan distributes consumer electronic products including, but not limited to, citizens band radios, corded and cordless telephones, radar detectors, and telephone answering machines under its registered Cobra trademarks in the United States and in many countries around the world.

9. Dynascan currently uses its registered Cobra trademarks in the United States, including the State of Florida, and in interstate commerce.

10. Dynascan annually sells in excess of $150 million of Cobra products in the United States.

11. Dynascan sold a small number of cordless telephones and other products under the Cobra trademark in South America prior to its relationship with Babbit.

12. Since 1977, Babbit has been involved in the sale and distribution of electronics

parts and cordless telephones in South Florida and South and Central America.

13. In 1978, Babbit began to sell and distribute cordless telephones manufactured by Dynascan bearing the Cobra trademark.

14. During the latter part of 1978, Babbit was also selling and distributing cordless telephones and electronic products bearing the federally registered trademark MCE, a mark owned by an affiliate of Babbit.

15. In the early 1980's, Babbit purchased certain overstock of Cobra cordless telephones from Dynascan for sale in South and Central America. This purchase was predicated on the Federal Communications Commission's ("FCC") decision to change frequencies for cordless telephones. The FCC allotted manufacturers of cordless telephones with the old frequency a grace period to sell the outdated cordless telephones. Dynascan had a large number of Cobra cordless telephones in inventory, and Babbit purchased certain models of this overstock for sale in South and Central America.

16. On August 16, 1985, Babbit and Dynascan entered into a contractual licensing agreement ("Agreement") pursuant to which Dynascan gave Babbit a license to use the Cobra trademark on certain models of cordless telephones in South and Central America.

17. The Agreement required Babbit to pay a royalty to Dynascan through back-to-back letters of credit, whereby Babbit would pay a higher unit charge to Dynascan than Dynascan would pay to the manufacturer of the telephones. Initially, Babbit paid a 10% royalty to Dynascan. The royalty was later lowered to 5% in late 1987 or early 1988.

18. The Agreement permitted Babbit to distribute the phones it ordered through Dynascan in South and Central America, but not in the United States.

19. The telephones ordered by Babbit through Dynascan pursuant to the Agreement were consigned to Babbit and shipped directly from the manufacturer to Babbit's bonded warehouse in Florida. The telephones were then stored in the bonded warehouse until they could be shipped to South and Central America.

20. Over time, the model numbers of the Cobra products that Babbit handled changed, but there were no changes in the basic terms of the Agreement. Dynascan inspected a sample of each new model of cordless telephone produced for sale under the Cobra trademark prior to the approval of production of any new model. Dynascan did not, however, inspect or receive a Model SA–660s cordless telephone.

21. In July, 1989, without Dynascan's knowledge, Babbit ordered 6,000 Model SA–660s cordless telephones bearing the Cobra trademark directly from Hyundai Corporation of Korea ("Hyundai"). The Model SA–660s telephones are upgrades of the Model SA–620s telephones that Babbit had ordered previously from Hyundai Corporation with Dynascan's knowledge and consent, pursuant to the Agreement. The Model SA–660s telephones are also identical to MCE Model 7312 telephones that Babbit had previously ordered from Hyundai Corporation for sale in South America under the MCE trademark.

22. In July, 1989, without Dynascan's knowledge, Babbit received 6,060 Model SA–660s cordless telephones bearing the Cobra trademark from Hyundai, including a 1% spare parts allowance.

23. The Cobra SA–660s cordless telephones ordered directly from Hyundai by Babbit in July of 1989 were shipped from Korea directly to Babbit's bonded warehouse in Florida.

24. Babbit did not notify Dynascan of its intention to order the Cobra SA–660s telephones from Hyundai prior to ordering them, and Babbit failed to notify Dynascan of the fact that it had ordered or received the Cobra SA–660s cordless telephones, even after the telephones arrived at Babbit's bonded warehouse in Florida.

25. The Cobra SA–660s telephones received by Babbit from Hyundai were MCE telephones that were relabelled as Cobra telephones.

26. Babbit paid no royalty to Dynascan for any of the Cobra SA–660s cordless telephones ordered and received directly from Hyundai in July, 1989.

27. In August, 1989, Babbit ordered 6,000 sets of Cobra nameplate labels and Cobra gift boxes for Model SA–620s cordless telephones directly from Hyundai, without Dynascan's knowledge. These labels and gift boxes were shipped directly from Korea to Babbit's bonded warehouse in Florida, without Dynascan's knowledge, in September, 1989.

28. "MCE" is a registered trademark of Metz Consumer Electronics, Inc. ("Metz"), an affiliate of Babbit. Robert Steinmetz and Sol Steinmetz are shareholders of both Babbit and Metz.

29. In August, 1989, without Dynascan's knowledge, Babbit ordered an additional 4,600 Model SA–660s cordless telephones bearing the Cobra trademark directly from Hyundai. At the same time, Babbit ordered 6000 gift boxes with Cobra SA–660s sticker labels directly from Hyundai without Dynascan's knowledge.

30. In September, 1989, without Dynascan's knowledge, Babbit received 4,646 Model SA–660s cordless telephones bearing the Cobra trademark, and 6000 Cobra SA–660s gift boxes bearing Cobra stickers. These telephones and gift boxes, manufactured by Hyundai, were shipped directly from Korea to Babbit's bonded warehouse in Florida.

31. Babbit failed to pay any royalties to Dynascan for any of the additional 4,646 Cobra SA–660s cordless telephones or 6000 Cobra SA–660s sticker boxes ordered and received directly from Hyundai.

32. In 1989, Babbit secretly shipped approximately 4,646 units of the Cobra SA–660s cordless telephones from the bonded warehouse in Florida to various points in South America. These units were contained in Cobra gift boxes bearing Cobra stickers that had been pasted over the "MCE" labels.

33. On November 30, 1989, and December 5, 1989, the United States Customs Service ("Customs") seized portions of Babbit's shipments of Cobra telephones. Customs seized a total of 8,145 cordless telephones from Babbit, pursuant to § 526 of the Tariff Act of 1930. Of the seized units, there were 6,145 Model SA–660s cordless telephones bearing the Cobra trademark, and 2000 Model SA–620s cordless telephones bearing the Cobra trademark.

34. On January 12, 1990, Dynascan informed Customs that it did not consent to the importation of the seized telephones, and Dynascan requested their forfeiture. At no time prior to the seizure of the SA–660s cordless telephones did Dynascan have knowledge that Hyundai was producing SA–660s telephones for sale as Cobra telephones, rather than as MCE telephones.

35. Dynascan's recordation with Customs identified Babbit as an authorized distributor of Cobra products.

36. On February 1, 1991, the United States declined to prosecute the seizures of Babbit's cordless telephones bearing the Cobra trademark. The 8,145 seized telephones were released to Babbit. Subsequently, Babbit exported these telephones to Textiles Internacionales of Panama.

37. The Court finds that the testimony of Sol Steinmetz and Robert Steinmetz is not credible. In particular, the Court finds not credible the Steinmetz' assertions that they were told by Dynascan that they would receive exclusivity over the entire South American market for Cobra cordless telephones. The Court finds that any promises of exclusivity only referred to the specific cordless telephone models expressly listed in the Agreement and any models that were later verbally added to the Agreement. Dynascan made no intentional misrepresentations of fact to Babbit that would suggest that Babbit was the exclusive distributor for all Cobra products in South and Central America.

38. The Court finds that there is no credible evidence suggesting that Babbit would not have entered the Agreement if it had known that Dynascan did not actually possess registered trademark protection in South America, as opposed to "use" trademark protection. The Court finds that Babbit entered the Agreement with Dynascan to avoid violating Dynascan's United States trademark registrations and to procure the legitimacy that is associated with Dynascan's United States and foreign trademark registrations and "use" protection. In fact, it is clear from the testimony of Robert Steinmetz

that Babbit needed the Cobra trademark to sell telephones in South America, because the MCE trademark had limited sales potential.

In addition, Dynascan did maintain a limited measure of trademark protection in South America, although it did not possess trademark registrations in most South American countries. Dynascan did not, however, file any administrative actions or legal challenges in South America to protect the Cobra trademark, primarily because of concerns about the judicial systems in several South American countries. (T.R. 106). Instead, Dynascan attempted to assert its trademark protection through the issuance of a letter of authenticity to Babbit in March, 1987.

39. The Court finds that the letter from Dennis Burke to Babbit, dated March 25, 1987, directly stating that, "Cobra owns trademark protection in many countries in South America," is not indicative of any fraud that allegedly occurred at the time that Babbit and Dynascan entered into their Agreement in August 1985. In addition, the Court finds that this letter does not state or directly imply that Dynascan owns trademark registrations, as opposed to trademark protection, in any particular South American country. This Court finds no credible evidence that Dynascan intended Babbit to believe that Dynascan had registered trademarks in South America.

40. Babbit is a sophisticated electronics dealer, but at no time prior to entering the Agreement or during the first four years of the contractual relationship did Babbit make any effort to determine whether Dynascan owned trademark registrations for Cobra in South America.

41. The contractual relationship between Babbit and Dynascan continued until Dynascan received knowledge that Cobra cordless telephones shipped by Babbit had been seized by Customs. Up to that point, the relationship had been mutually successful and highly profitable for both Babbit and Dynascan. Between 1982 and 1989, Babbit sold over six million dollars worth of Cobra products in South America, and Babbit received, on average, a 25% profit margin on all Cobra sales. Babbit's profits from its relationship with Dynascan totaled approximately 1.5 million dollars.

42. Babbit, Sol Steinmetz and Robert Steinmetz each offered the Model SA–660s Cobra cordless telephones for sale, and directed such sales, from Babbit's office in Florida. Sol Steinmetz and Robert Steinmetz controlled, directed and participated in these activities.

43. Dynascan is the owner of Korean Trademark Registration No. 59154 for the Cobra trademark.

44. Babbit, Sol Steinmetz and Robert Steinmetz intentionally used the Cobra trademark on the shipment of Cobra SA–660s cordless telephones that was exported to Panama in May, 1991.

45. Babbit's unauthorized use of the Cobra trademark on the Cobra SA–660s cordless telephones that were exported to Panama in May, 1991, is likely to cause confusion, mistake or to deceive customers into believing that the SA–660s cordless telephones are licensed, authorized, sponsored or approved by Dynascan. In addition, Babbit's unauthorized use of the Cobra trademark on the Cobra SA–660s cordless telephones is likely to cause consumers to confuse the Cobra SA–660s, an unapproved or unauthorized product, with the Cobra SA–620s, an approved product and authorized product.

46. The Court finds that the testimony regarding Dynascan's alleged tortious interference with Commtron is either not credible or is hearsay evidence. It is clear that Babbit was never told that it could not purchase products from Commtron, although Babbit's credit privileges may have been reduced or eliminated for a short period of time. In addition, the Court finds that the statements made by Dynascan to Commtron were not made with any malice towards Babbit. The statements were simply reflections of Dynascan's belief that Babbit had violated a contract and imported counterfeit Cobra products.

47. Babbit, Sol Steinmetz and Robert Steinmetz are the controlling force behind all of Babbit's sales of unauthorized Cobra products in South America, and have personally

orchestrated such activities from Babbit's corporate office in Florida.

48. Babbit's sales of unauthorized telephones in South America prior to and after the seizure by Customs amounted to a total sum of $561,868.30. The five percent royalty that Babbit was required to pay to Dynascan on all Cobra sales, but failed to pay as to these unauthorized sales, amounts to a total sum of $28,093.42. Babbit's profits on these unauthorized sales was approximately 25% of the total sales, or $140,467.08.

## II. CONCLUSIONS OF LAW

### A. THE COMPLAINT: COUNTS 1, 2, AND 4

#### 1. Fraudulent Misrepresentation & Declaratory Judgment

■ In Count I of the Complaint, Babbit claims that Dynascan engaged in fraud by falsely representing that it owned the Cobra trademark in various South American countries. Under Florida law, the essential elements of fraud include: (1) a false statement concerning a specific material fact; (2) a showing that the representor knew or should have known that the representation was false; (3) an intent that the representation induce another to act on it; and (4) consequent injury to the party acting in justifiable reliance on the representation. *Royal Typewriter Company v. Xerographic Supplies Corp.,* 719 F.2d 1092 (11th Cir.1983); *Saunders Leasing System, Inc. v. Gulf Central Distribution Center, Inc.,* 513 So.2d 1303, 1306 (2nd Fla. DCA1987).

■ The Court concludes that Dynascan did not make any false statements concerning specific material facts or any false representations that it held trademark rights in the Cobra trademark in South America prior to the date when the parties entered the Agreement. The only credible evidence presented by Babbit regarding false representations occurred after the signing of the Agree-

ment between Babbit and Dynascan in 1985. Therefore, these statements cannot have been intended to convince Babbit to enter the Agreement. In fact, the Court finds that Babbit entered the Agreement with Dynascan to avoid violating Dynascan's United States trademark registrations and to procure the legitimacy that would be associated with Dynascan's United States and foreign trademark registrations and "use" protection. It is clear from the testimony of Robert Steinmetz that Babbit needed the Cobra trademark to sell telephones in South America, because the MCE trademark had limited sales potential.

■ Indeed, even the post-Agreement statements made by Dynascan to Babbit only represented that Dynascan had trademark rights or protection in South America, not that it possessed trademark registrations. This legal distinction is not a misrepresentation of fact because Dynascan did possess trademark protection, albeit "use" protection. Whether Dynascan chose to take advantage of that "use" protection by filing administrative actions in South American countries is irrelevant, because Dynascan clearly had that right and did not misrepresent its ownership of that right. Therefore, the Court concludes that Babbit has failed to prove by a preponderance of the evidence that Dynascan engaged in fraud.[1]

#### 2. Tortious Interference with a Business Relationship

■ In Count IV of the Complaint, Babbit alleges that Dynascan has engaged in tortious interference with Commtron, one of Dynascan's domestic distributors and Babbit's suppliers. To recover for tortious interference, Babbit must prove: (1) the existence of a business relationship under which Babbit has legal rights; (2) knowledge by Dynascan of such relationship; (3) an intentional and unjustified interference with such relationship by Dynascan; and (4) damage to Babbit

---

1. In Count II of the Complaint, Babbit seeks a declaratory judgment concerning Babbit's obligation to pay royalties on the 1989 sale of Cobra goods to Panama. Babbit argues that the Agreement between Babbit and Dynascan should be rescinded by the Court because it was fraudu-

lently induced by Dynascan. The Court, however, has concluded that Babbit did not prevail on its fraud action against Dynascan. Consequently, the Court denies Babbit's request for a declaratory judgment.

as a result of the breach of the relationship. *T. Harris Young & Assoc., Inc. v. Marquette Electronics, Inc.*, 931 F.2d 816, 825–26 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991).

■ The Court concludes that Babbit has failed to demonstrate that Dynascan engaged in tortious interference because any interference in the relationship between Babbit and Commtron was justified by Babbit's breach of contract with Dynascan. The only statements that the Court found that Dynascan made to Commtron concerning Babbit reflected Dynascan's reasonable belief that Babbit breached the Agreement and imported counterfeit goods. *See Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225 (3rd Fla. DCA1980), *cert. denied,* 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981) (Court held that under Florida law, a party is allowed to interfere in another's business relationship where the party acts in furtherance of its own interests, such as to protect a contract.). In addition, Babbit failed to introduce credible evidence to support its allegation that Dynascan expressly instructed Commtron that it should not deal with Babbit. Consequently, the Court concludes that Babbit has failed to prove by a preponderance of the evidence that Dynascan engaged in tortious interference with Babbit's business relationship with Commtron.

## B. DYNASCAN'S COUNTERCLAIM

Dynascan's counterclaim sets forth a number of allegations, including claims that Babbit engaged in unfair competition, violated a number of federal and state trademark statutes, and breached the Agreement. The Court will initially address the breach of contract issue. The Court will then address Dynascan's trademark infringement claim and counterfeiting claim. Thereafter, the Court turns its attention to Dynascan's unfair competition claim, including the common law claim for unfair competition and the two statutory state law claims. Finally, after a brief analysis of Dynascan's tariff act claim, the Court will conclude with a discussion of the imposition of damages.

### 1. Breach of Contract [2]

■ The express terms of the Agreement between Babbit and Dynascan are contained in the August 16, 1985 letter sent from Dynascan to Babbit. In this Agreement, Dynascan gave Babbit a license to use the Cobra trademark on certain cordless telephone models in Central and South America. A royalty was to be paid to Dynascan through back-to-back letters of credit whereby Babbit would pay a higher unit charge to Dynascan than Dynascan would pay to the manufacturer of the cordless telephones.

In July and August, 1989, Babbit ordered and received over ten thousand cordless telephones that it attempted to sell in South America as Cobra products. Babbit, however, in violation of the terms of the Agreement, failed to notify Dynascan about the manufacture and distribution of these products, and Babbit failed to pay Dynascan the standard five percent royalty that was an integral component of the Agreement. Consequently, the Court concludes that Babbit breached its contract with Dynascan by failing to pay a royalty to Dynascan and by failing to order the SA–660s Cobra cordless telephones through Dynascan as required in the Agreement.

### 2. Trademark Infringement

■ Dynascan's trademark infringement claim, pursuant to 15 U.S.C. § 1114(1)(a),[3]

---

**2.** The breach of contract cause of action alleged by Dynascan is set out in Count VIII of Dynascan's Counterclaim.

**3.** Section 1114 provides, in pertinent part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy or colorably imitate a registered mark and apply such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to

rests on the notion that a particular use of a registered trademark is likely to cause confusion. In this case, the registration of the trademarks is not an issue, because Dynascan presented certificates of registration for each of the "Cobra" trademarks owned by Dynascan. The Court must therefore determine whether Babbit's use of the Cobra trademark is likely to cause confusion in the minds of potential buyers as to the source, affiliation or sponsorship of the products. *Interstate Battery System v. Wright,* 811 F.Supp. 237, 241 (N.D.Tex.1993).

■ In determining whether there is a likelihood of confusion, the Court may consider a variety of factors, including similarity of design, similarity of the products, identity of retail outlets and purchasers, similarity of advertising media, the defendant's intent and actual confusion. *Jaguar Cars Ltd. v. Skandrani,* 771 F.Supp. 1178, 1183 (S.D.Fla.1991). Application of these elements to the facts of this case compels the conclusion that Babbit's sale of Cobra cordless telephones is likely to confuse the public into believing that Babbit's products are associated with Dynascan or that Dynascan sponsored, licensed or consented to the manufacture and sale of Babbit's products. The marks used by Babbit are identical to the Cobra trademarks owned by Dynascan, and the Model SA–660s telephones sold by Babbit containing a Cobra label are nearly identical to Dynascan's Model SA–620s cordless telephones.

In addition, although there is no evidence of actual confusion,[4] this Court has found that Babbit intentionally infringed upon Dynascan's trademark rights and intentionally breached the Agreement. "Intent to copy in itself creates a rebuttable presumption of likelihood of confusion." *Bauer Lamp Co., Inc. v. Shaffer,* 941 F.2d 1165, 1172 (11th Cir.1991), *citing, Ambrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1542 (11th Cir.1986). *See also First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1385 (9th Cir.1987) ("Intent of a defendant in adopting his trade dress is a critical factor, since if the trade dress were

adopted with the intent of depriving benefit from the reputation of the plaintiff, that fact alone may be sufficient to justify the inference that there is confusing similarity.").

■ In fact, a likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark. *Interstate Battery System,* 811 F.Supp. at 243, *citing, Amstar v. Domino's Pizza,* 615 F.2d 252, 263 (5th Cir.1980), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Babbit intended to improve sales of MCE telephones by relabeling them with Cobra labels because Babbit was having difficulty selling MCE telephones. Based on the foregoing discussion, the Court concludes that there has been trademark infringement as determined by the likelihood of confusion analysis.

■ Babbit presents several arguments in opposition to a finding of likelihood of confusion. First, Babbit contends that there cannot be a showing of likelihood of confusion because Babbit's telephone sales did not occur in the same market as Dynascan's telephone sales. Babbit states that "when goods travel in unrelated trade channels, no likelihood of confusion exists." (D.E. # 165 at p. 34). This Court concludes, however, that "confusion, or the likelihood of confusion, not competition, is the real test of trademark infringement." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257–58 (2nd Cir.1987). Direct competition between the parties is not a prerequisite to relief under the Lanham Act. In fact, the Court would not expect to find substantial evidence demonstrating that Dynascan was in competition with Babbit in South America because Babbit was already selling Cobra telephones in that geographic territory with Dynascan's permission. Regardless of Dynascan's activities at the time of the infringement, its name continued to be a marketable commodity and it has the right to use it on other goods or to grant such a license to other companies. *Bowmar Instrument*

---

cause mistake, or to deceive, shall be liable in a civil action by the registrant.

**4.** "Evidence of confusion is not a prerequisite to a finding of likely confusion." *Jaguar Cars Ltd.,*

771 F.Supp. at 1184, *citing, E. Remy Martin & Co. v. Shaw Ross Internat'l Imports, Inc.,* 756 F.2d 1525, 1529 (11th Cir.1985).

*Corp. v. Continental Microsystems, Inc.*, 497 F.Supp. 947, 208 U.S.P.Q. 496, 503 (S.D.N.Y. 1980).

■■■ As a corollary to this argument, Babbit contends that United States copyright laws and the Lanham Act do not apply to Babbit's sales of cordless telephones because the sales occurred outside of the United States. This argument is not compelling because this Court has already found that Lanham Act jurisdiction exists because Babbit imported cordless telephones into the United States to a free trade zone before shipping the products to South America. (T.R. at 5). Babbit presses this argument, however, by presenting the Court with *Zenger–Miller, Inc. v. Training Team, GMBH*, 757 F.Supp. 1062 (N.D.Cal.1991).

In *Zenger–Miller*, the court concluded that there was no subject matter jurisdiction over Lanham Act claims where all of the defendant's sales occurred in Germany. A close examination of the underlying rationale of *Zenger–Miller*, however, clearly supports this Court's conclusion that the Lanham Act can apply where sales occur outside of the United States. Specifically, the *Zenger–Miller* court found that the defendant was a foreign corporation and all negotiations leading to the contract in that case occurred abroad. In the instant case, Babbit is an American corporation, and the negotiations leading to the Agreement occurred primarily in the United States. In addition, the defendant in *Zenger–Miller* did not allege that any infringing activity took place in the United States. Babbit, however, imported labels and telephones into a free trade zone in the United States, and Babbit orchestrated sales from a Florida office.

In *Reebok Internat'l v. American Sales Corp.*, 11 U.S.P.Q.2d 1229, 1989 WL 418625 (E.D.Wash.1989), the court upheld the invocation of Lanham Act jurisdiction where the defendant, a California corporation, imported counterfeit shoes from Taiwan to a free trade zone in Los Angeles and then exported the goods to Belgium. The court noted that "the Lanham Act imposes upon this court the duty to protect the entire gamut of purchasers, including non-English speaking purchasers, in various countries throughout the world to which the defendants intend to export their products." *Id.* at 1231. Consequently, this Court concludes that it has jurisdiction to address the trademark infringement counterclaim, even though Babbit's sales of cordless telephones occurred outside of the United States. *See also Ocean Garden, Inc. v. Marktrade Co., Inc.*, 953 F.2d 500, 505 (9th Cir.1991) (Court held that "entry of infringing goods into a foreign trade zone is a sufficient act in commerce to trigger subject matter jurisdiction in federal courts under the Lanham Act.").

■■■ Babbit also argues that Dynascan has engaged in "naked licensing" and thereby forfeits all rights to the Cobra mark in the geographic and product markets where use of the mark has not been adequately protected. In this instance, there is substantial evidence that a number of counterfeiters were active in South America during the mid–1980s. "The existence of third party infringers, however, does not constitute an abandonment of a mark where the trademark owner does not consent to the use of the mark by these others but rather, vigorously pursues these third party infringers." *Visa International v. Bankcard Holders of America*, 211 U.S.P.Q. 28, 41, 1981 WL 40539 (N.D.Ca.1981). In addition, the party seeking to prove abandonment must prove intent to abandon on the part of the trademark owner. *Id.* Although Dynascan did not act with particular vigor against third party infringers in South America, failure to institute legal action against an infringer is insufficient to establish abandonment of a trademark. *Playboy Enterprises v. P.K. Sorren Export Co.*, 546 F.Supp. 987, 996 (S.D.Fla. 1982). Babbit has utterly failed to prove that Dynascan intentionally abandoned its Cobra mark or ceased use of the Cobra trademark.

■■■ Finally, Babbit argues that there is no violation of the Lanham Act because the articles that are alleged to be counterfeits are actually genuine goods, produced in the same factory as the approved Cobra telephones. It is true that the unauthorized sale of a genuine trademarked product does not in itself constitute trademark infringement, but Babbit fails to appreciate that identical

goods sold in an unauthorized manner are not necessarily genuine for purposes of the Lanham Act. *Hunting World, Inc. v. Reboans, Inc.,* 24 U.S.P.Q.2d 1844, 1849, 1992 WL 361741 (N.D.Ca.1992), *citing, H.L. Hayden Co. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1023 (2nd Cir.1989). In this instance, Babbit failed to order the Model SA–660s telephones through Dynascan, and Babbit failed to submit a sample Model SA–660s telephone to Dynascan for approval. In fact, the Model SA–660s cordless telephone, originally a MCE model, is physically different from all other Cobra models. Although there is no evidence suggesting that the Model SA–660s cordless telephones are inferior to authorized Cobra products, inferiority is not a prerequisite to a finding of a Lanham Act violation. *Tanning Research Lab. v. Worldwide Import and Export,* 803 F.Supp. 606, 609 (E.D.N.Y.1992). "Congress hardly intended to step through the looking glass into a world in which valid trademark owners were only protected from inartful counterfeiters." *Id.*

### 3. Counterfeiting

■ In order for Dynascan to prevail on its counterfeiting claim, it must demonstrate that Babbit infringed a registered trademark in violation of 15 U.S.C. § 1114(1)(a), and it must prove that Babbit "intentionally used a mark, knowing such mark is a counterfeit mark." 15 U.S.C. § 1117(b).[5] The Court has determined that Babbit infringed registered marks in violation of 15 U.S.C. § 1114(1)(a). The Court has also found that Babbit intentionally used the marks in question. "The analysis therefore focuses on whether [Babbit] used the marks knowing that they were counterfeit."[6]

■ In the Agreement, Babbit and Dynascan agreed that Babbit could use the Co-

bra trademark in connection with the distribution and sale of certain models of cordless telephones in South America, as long as Babbit ordered the products through Dynascan. Although the models that were subject to the Agreement changed over a period of years, the ordering procedures did not change. The Agreement clearly contemplated that Babbit's right to use Dynascan's trademarks only extended to products ordered through Dynascan, not to cordless telephones ordered outside the terms of the Agreement. Babbit, however, attached Dynascan's trademarks to other cordless telephones, namely Model SA–660s telephones. Therefore, Babbit had knowledge that the telephones to which they affixed Dynascan's marks were not Dynascan's telephones and that their acts contravened the terms of the Agreement. *See Interstate Battery System,* 811 F.Supp. at 244 (Court held that licensee that used trademark on batteries bought from a different source than the trademark owner and in violation of a licensing agreement was a counterfeiter.). Consequently, it is clear that Babbit used Dynascan's trademarks knowing that they were counterfeit. Babbit is therefore liable for trademark counterfeiting.

### 4. Unfair Competition, False Designation & Dilution

■ Dynascan also presents an allegation of false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), state law causes of action for dilution, pursuant to Fla.Stat. § 495.151, and unfair and deceptive trade practices, pursuant to Fla.Stat. § 501.204(1), and a common law cause of action for unfair competition. The same set of facts enabling Dynascan to prevail under Section 1114(1)(a) will result in recovery pursuant to Section 1125. *Marathon Mfg. Co.v . Enerlite Products Corp.,* 767

---

5. Section 1117 provides, in pertinent part:

(b) Treble damages for use of counterfeit mark
In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation of section 1114(1)(a) of this title or section 380 of Title 36 that consists of intentionally using a mark or

designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services.

6. A "counterfeit mark" means "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127.

F.2d 214, 217 (5th Cir.1985). This is because Section 1125(a) is broader than Section 1114 in that it covers false advertising or description whether or not it involves trademark infringement. *Silverstar Enterprise, Inc. v. Aday*, 537 F.Supp. 236, 218 U.S.P.Q. 142, 146 (S.D.N.Y.1982). In addition, the analysis is the same for Dynascan's unfair competition cause of action. *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir.1991); *Clairol, Inc. v. Save–Way Industries, Inc.*, 210 U.S.P.Q. 459, 470, 1980 WL 30222 (S.D.Fla.1980). This Court's analysis is therefore equally conclusive of these issues.

■■■■■■ Finally, Dynascan is entitled to relief under the state cause of action for dilution. *See Jaguar Cars Ltd. v. Skandrani*, 771 F.Supp. 1178, 1185 (S.D.Fla.1991). Section 495.151 provides that any person using a mark is entitled to an injunction enjoining:

> Subsequent use by another of the same or similar mark ... if it appears to the court that there exists a likelihood of injury to business reputation or of dilution of the distinctive quality of the mark, ... notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services.

Fla.Stat. § 495.151. There is a strong likelihood of dilution in the present case because

purchasers may associate Babbit's telephones with Dynascan telephones.[7]

## C. DAMAGES AND INJUNCTIVE RELIEF

■■■■■■ Dynascan argues that it is entitled to a plethora of damages pursuant to the Lanham Act, including a permanent injunction, treble damages, attorney's fees and costs, and prejudgment interest.[8] The Lanham Act provides for recovery by a successful plaintiff of: "(1) defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of this action." 15 U.S.C. § 1117. This recovery is cumulative, that is, the Court may award Dynascan both its damages and Babbit's profits. *Playboy Enterprises*, 546 F.Supp. at 997. There are, however, different standards for the awarding of each measure of damages.

### 1. Babbit's Profits

■■■■■■ Where the defendant's infringement is deliberate and willful, as in this case, an accounting for profits is proper under a theory of unjust enrichment. *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir.1980). This accounting serves to deter future infringement, and is thus appropriate even where the plaintiff is not in direct competition with the defendant. *Id.* In this instance, Babbit has demonstrated and the Court has found that Babbit's profits averaged 25% on all sales of Cobra products.

---

7. The Court agrees with Babbit that Fla.Stat. § 501.201–213 only provides remedies for consumer transactions and has no application to this cause of action. *Bryant Heating & Air Conditioning v. Carrier Corp.*, 597 F.Supp. 1045, 1053 (S.D.Fla.1984).

The Court also notes that Dynascan has presented no case law, nor can the Court find any case law, suggesting that the Tariff Act of 1930, 19 U.S.C. § 1526, applies to a standard trademark infringement case. Although the plain language of the Tariff Act suggests that a party may not import trademarked merchandise into the United States without the consent of the trademark owner, this Court concludes that "there is no evidence that Congress intended such a sweeping scope to § 1526(a)." *See Vivitar Corp. v. United States*, 593 F.Supp. 420, 435 (Ct. Int'l.Trade 1984) (Court held that "construing § 1526 to apply when a foreign source of imports is related to, or the agent of, the American trademark owner could lead to results that Congress

could not reasonably have intended when it enacted the section.").

8. Babbit's sales of Model SA–660s cordless telephones bearing a Cobra trademark have infringed Dynascan's trademark registrations in violation of the Lanham Act, 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a). Consequently, Dynascan is entitled to an injunction enjoining Babbit and its corporated affiliates and subsidiaries, officers, agents, servants, employees, attorneys and those in active concert and participation with them from the unauthorized use or employment in connection with buying, advertising, promoting, displaying, offering for sale or distributing of goods or merchandise containing or having attached or having in association therewith Dynascan's Cobra trademarks and trade name or colorable imitations thereof and specifically including cordless telephones manufactured by Hyundai or any related companies. 15 U.S.C. § 1116(a). *See Jaguar Cars, Ltd.*, 771 F.Supp. at 1185.

Babbit's sales of infringing products to South America amounted to a total sum of $561,-868.30. Babbit's profits on these sales, calculated consistent with Babbit's 25% profit margin, totaled $140,467.08.

### 2. *Dynascan's Damages*

In order to recover damages (apart from Babbit's profits), Dynascan must demonstrate that it suffered actual damages. *Id.* at 587. "The mark owners royalties are normally used as the measure of damages", but the plaintiff must prove both lost sales and that the loss was caused by defendants' actions. *Playboy Enterprises,* 546 F.Supp. at 998. Dynascan has not demonstrated that it would have made any of the sales that Babbit has made, but the Court concludes that it has demonstrated that Babbit would have purchased authentic Cobra telephones had they not acquired the counterfeit telephones. The Court draws this conclusion because Babbit was unable to sell its MCE labelled telephones, and the sales of Cobra telephones were still highly profitable, as demonstrated by the sale of the counterfeit telephones. Thus, Dynascan is entitled to an award of damages for Babbit's failure to pay the required five percent royalty on cordless telephone sales of $561,868.30. Consequently, Dynascan is entitled to damages totalling $28,093.42.[9]

### 3. *Trebling of Damages*

The Court may, in its discretion, reduce or enhance the resulting award up to three times the amount of profits or damages, whichever is greater, as justice shall require. 15 U.S.C. § 1117(a). Such an award is discretionary, but it may not be punitive, and must be based on a showing of actual harm. *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3rd Cir.1978). If the infringement is intentional, however, and the use of a counterfeit trademark has been proven, then § 1117(b) governs, and the Court is required to treble damages and award attorney's fees

unless the Court finds extenuating circumstances. *Chanel, Inc.,* 931 F.2d at 1476. *See also Louis Vuitton S.A. v. Lee,* 875 F.2d 584, 588 (7th Cir.1989).

Dynascan has demonstrated and this Court has found that Babbit intentionally infringed the Cobra trademark and used a counterfeit Cobra trademark. Consequently, the Court finds that a trebling of damages is required. Pursuant to this conclusion, Dynascan is entitled to a trebling of Lanham Act damages from Babbit for lost profits in the amount of $421,401.24.

### 4. *Costs*

Dynascan is entitled to recover its costs. 15 U.S.C. § 1117; *Fed.R.Civ.P.* 54(d). Dynascan is directed to submit a bill of costs to the Court within fifteen (15) calendar days of the date of this Order.

### 5. *Attorney's Fees*

In an exceptional case, the Court may award attorney's fees. 15 U.S.C. § 1117. This is an exceptional case because Babbit intentionally arranged to obtain counterfeit goods from Hyundai, intentionally avoided contractual obligations, and intentionally passed off such goods as Cobra products. Consequently, attorney's fees are awarded to Dynascan.[10] Dynascan is directed to submit a detailed affidavit describing the work done, the time involved, and the amount claimed for each such item of work within fifteen (15) calendar days of the date of this Order.

### 6. *Prejudgment Interest*

The Court may, in its discretion, award prejudgment interest on the total amount of the damages award. 15 U.S.C. § 1117. For the reasons stated above, Dynascan is awarded prejudgment interest, beginning with the date that Dynascan filed its original counterclaim, filed January 26, 1990,

---

9. Dynascan is also entitled to damages in the form of lost royalties pursuant to Babbit's breach of contract.

10. The Court notes that Dynascan is also entitled to attorney's fees pursuant to the Agreement.

Specifically, Babbit's breach of the Agreement entitles Dynascan to attorney's fees pursuant to the personal guarantees executed by Robert and Sol Steinmetz in connection with the Agreement.

**960**

to the conclusion of the trial of this matter, November 13, 1992.

*7. Personal Guarantee of Damages Award*

 Dynascan has requested that all relief awarded in this case be applied jointly and severally to Defendants Babbit, Robert Steinmetz and Sol Steinmetz. Robert Steinmetz is President of Babbit and Sol Steinmetz is Chairman of Babbit. Both officers testified that they were personally involved in the unauthorized purchase and sale of Cobra products, even after receiving notification from Dynascan that the sale of any Model SA–660s cordless telephones was a violation of the Agreement and trademark statutes. "If an individual actively and knowingly caused the trademark infringement, he is personally responsible." *Chanel, Inc.*, 931 F.2d at 1477. Specifically, a corporate officer who directs, controls, ratifies, participates in, or is the moving force behind the infringing activity, is personally liable for such infringement without regard to piercing of the corporate veil. *Selchow & Righter Co. v. Goldex Corp.*, 612 F.Supp. 19 (S.D.Fla. 1985). Neither Robert nor Sol Steinmetz submitted any evidence to contest the fact that they authorized, directed and participated in the infringement of Dynascan's trademark. *See Tanning Research Lab. v. Worldwide Import & Export*, 803 F.Supp. 606, 610–11 (E.D.N.Y.1992) (Court held shareholders and officers personally liable for trademark infringement where the individuals infringed trademark even after notification from the trademark owner). Consequently, Robert Steinmetz and Sol Steinmetz are jointly and personally liable for their participation in Babbit's counterfeiting activities.

### III. CONCLUSION

For the preceding reasons, it is hereby

ORDERED AND ADJUDGED that judgment shall be entered in favor of Defendant Dynascan and against Plaintiff Babbit as to Babbit's Complaint, and in favor of Counterplaintiff Dynascan and against Counter-defendant Babbit as to Dynascan's Counterclaim, by separate order, pursuant to *Fed. R.Civ.P.* 58.

DONE AND ORDERED.

### FINAL JUDGMENT

THIS CAUSE comes before the Court after a non-jury trial commencing November 12, 1992. As explained in the accompanying Memorandum Opinion and Order, it is hereby

ORDERED AND ADJUDGED that:

(1). Plaintiff Babbit Electronics, Inc. SHALL take nothing by its claims and actions herein and Defendant Dynascan Corporation SHALL go hence without day.

(2). Counter–Plaintiff Dynascan Corporation SHALL recover and receive in damages, pursuant to its counterclaim, as well as the treble damages provision of 15 U.S.C. § 1117(b), from Counter–Defendant Babbit Electronics, Inc., Sol Steinmetz, and Robert Steinmetz, jointly and severally, the sum of $449,494.66, which sum shall bear interest at the statutory rate until paid, for which sum let execution issue.

(3). Babbit Electronics, Inc., Sol Steinmetz, Robert Steinmetz and Babbit's corporated affiliates and subsidiaries, officers, agents, servants, employees, attorneys and those in active concert and participation with them are permanently enjoined from the unauthorized use or employment in connection with buying, advertising, promoting, displaying, offering for sale or distributing of goods or merchandise containing or having attached or having in association therewith Dynascan's Cobra trademarks and trade name or colorable imitations.

(4). The Court retains jurisdiction to enforce the terms of the permanent injunction, and other orders of the Court previously entered, as well as to award reasonable attorney's fees, costs, and prejudgment interest, to be determined by this Court at a later date upon appropriate motion, pursuant to *Fed.R.Civ.P.* 54 and Southern District of Florida Local Rule 7.3.

(5). This case is closed, and all pending motions are denied as moot.

DONE AND ORDERED.